Good morning and may it please the court. Jia Kim appearing on behalf of appellant Anthony Ped. When law enforcement conducts a warrantless search of a residence pursuant to a probation or parole condition, they must have probable cause as to residence. This standard means, considering the totality of the circumstances, would an officer of reasonable caution believe that the person with the search condition actually lives at that would not have proceeded, as the Santa Paula police officers did, in searching the home of Mr. Ped and his mother Sharon Wilson on October 6, 2016. And there are three circumstances in the totality of the circumstances that should have put them on notice of the need to make further inquiry and would have given an officer of reasonable caution pause before entering and searching without a warrant. The first is simply the age of the address information itself. The search occurred in October. Officer Rivera, sort of the lead officer here, indicated he knew that address information was given in April. Now, the address information also appears on a list generated on June 27th by Ventura County Probation, and there had been other interactions at that house, but none of those post dated. One says mid 2016, but I think it's safe to assume that none of those encounters post dated June 27th. So, simply the age should have perhaps planted a seed of doubt as to whether this person is still on supervision at all and that this is their supervision address. So, is your position that we should adopt a rule that they can't rely on any information that's more than three months old? They have to get something more recent than that before they can do a search? No, Your Honor. I don't think there's a need to create a bright line rule from this case because I think what's even more important about that June 27th list is that next to Nick Wilson, and he is the pearly supervisee in this case, next to that is a handwritten notation in all caps that says warrant. So, the officers knew that as of June 27th, there was a warrant out for Mr. Wilson's arrest, and I think a reasonable officer putting together the age of the information plus the warrant would have asked, you know, has this warrant been acted on within the last, I think it's 101 days, is it possible that Mr. Wilson's been picked up on this warrant and been reincarcerated for a violation of supervision or new offenses or alternatively the warrant could be disposed of in some manner short of incarceration that would still result in the change of address such as a residential treatment program? So, I think it is in the bright line three-month rule, but here we also have the additional, I think, very important factor of the warrant status. And then third, nevertheless, the officers could, you know, go to the house or conduct further investigation. Third, once they get to the house, there are two family members who immediately, basically as soon as they see the officers and learn what is going on, say, you know, Nick doesn't live here anymore. And that's both Mr. Pedd and his mother, as you can see on the video. Do you think we have to, I mean, does the government have to rely upon that statement by someone present? It seems to me that would be a pretty dangerous precedent because then you just tell, if you know that the government's after you, just tell everybody to say, hey, tell them I don't live here anymore. And then you've inoculated yourself in some degree. No, Your Honor, but I think on the facts of this case, Officer Rivera put in his declaration, you know, I know, and this makes common sense, as Your Honor noted, that sometimes family members of probationers lie for them as to where they're living to cover for them. But here, in fact, it's incriminating because if he is not living at his reported address and they have told them, you know, this is his reported address, we're coming to search it, that also puts him in violation of supervision. So in the cases, there are cases where officers come to search an address which is unreported, and in that case, I don't think you can necessarily place much weight on an occupant saying, oh, he doesn't live here because that would be incriminating. But again, I also think that single factor alone, there would not need to be a right-line rule. It's the combination of the more than three months old, the warrant, plus the statements that he doesn't live here. And I think the additional statement that the mother makes where she says Menga knows he doesn't live here, and Menga, whom she identified by name, is his probation officer. He's the person whose name and two phone numbers are at the top of this list. Could you address our decision in Motley? Because they're, it is the last reported address. They get there, and the people there deny that he's there. And we said, you know, it may not, you know, it's sort of a certainty, but all they need is probable cause. Certainly, Your Honor. I think there's a few things that distinguish this case from Motley. First of all, in Motley, the address information was much newer. The record showed there was some dispute, but the court found the record showed that it was prepared within the last month. So it was sort of a task force, and someone was tasked with preparing these packets on various parolees in the neighborhood. Second, there's nothing in Motley analogous to this warrant notation to indicate, you know, from a disinterested party, the probation officer, not the girlfriend or the mother, saying, you know, this person has a warrant out for him. And, you know, this, you should proceed with caution in assuming this is his address when people in warrant status have a good chance of being picked up. In fact, here, he was arrested the very next day after the list was prepared. And third, I think, the occupants of that residence in Motley were his girlfriend and their infant child. So the court noted in a footnote, it did not expressly rely on this, but, you know, he had a dependent living at that address. So it was natural to assume that he would go back to that address. And I think fourth, there is in Motley here, the mother says, you know, he doesn't live here anymore. And the officer's response is, yes, but he gave this address back in April. In Motley, the girlfriend said, you know, he's not here, he's in custody. And the officers there said, no, we know that he's been released. So there is some sort of factual mistake, or there is some other belief that they are relying on in that doesn't exist here. Whereas the April date, they're not specifically contradicting him saying, no, I just checked and I know he hasn't moved. This is still his address. So I think those factors would distinguish this from Motley. Did you want to address the remand question? Sure, Your Honor. So I think the authorities the court provided certainly present a strong case that remand is maybe this court's only option. But I think that it's still, as an exercise of discretion, the strongly preferred option. That is what happened in Evans itself. This is a standard condition from the central district of California, which has since been superseded. So it makes sense to give that court the first crack at it. And third, I think as a practical matter, upon remand, the district court ends up issuing a new judgment, which appears on the docket, and then everyone can be on the same page as to these are what the conditions, the operative conditions are. And there's no question about putting together this court's opinion. With the mem dispo floating around somewhere for the, yeah, okay. Thank you. You want to reserve? Yes, Your Honor. Great, thank you. Okay. Good morning, Your Honors, and may it please the court. My name is Jake Nair, and I represent the United States. This court should affirm the district court's denial of defendant's motion to suppress because the district court properly concluded that the Santa Paula Police Department had probable cause to believe that Nick Wilson lived at the Elliott Street address. And even though they were incorrect, they acted in good faith in making the search based on their past experiences at the family home of Nick Wilson and the list provided to them by Ventura County Probation. Do you think there's a limit on how infrequently the list can be updated and still be a basis for probable cause? I mean, suppose they, they made the list annually. Would that be good enough, a year old list? Your Honor, as this court knows, it's a totality of the circumstances situation. So here there could be instances where relying on a three month old list or a six month old list is inappropriate. But here we had corroborating facts, specifically the knowledge of the Santa Paula Police Department and Officer Rivera, specifically in this family home. They had responded to family resided here. They did a previous probation search in June 23rd, 2016. So they had a lot of knowledge about this. And Your Honor, we're also, it's important to note out, we're not dealing with an apartment or a situation that more, that is more transient. We're dealing with a family home here. But do you know, I mean, I realize, I appreciate you don't represent the city, but, you know, why don't they update it more frequently? I mean, it's not like they need to print. I mean, it can be done electronically, so they could, it could be continuously updated. Why don't they do that? Your Honor, there's not an exact answer to that in the record. However, I will say that there are always additional steps an officer could take to confirm. But that is not really what is required of the probable cause analysis. You know, an officer could sit outside the home overnight and watch, and maybe in a situation like many of the cases in this area are dealing with, where you're trying to search a residence that is not the probationer's listed residence, additional steps, specifically that step, Your Honor, may be required. But under, under the facts of Motley, which Your Honor pointed out is very, very similar to the case, that does not appear to be required. The only real difference in Motley between the facts here is they were dealing with approximately one month old information compared to three month old. In Motley, like here, it was a approximately a month before the search, an officer was tasked with compiling address information. At some point prior to the search in Motley, much like here, they had, they had knowledge that the probationer lived there. And finally, much like this case in Motley, when they arrived, the resident said, hey, they didn't, they don't live here. But in Motley, they actually went a step further and said, hey, he's in custody. They provided specific information that were not given here when the resident simply said he doesn't live here anymore. Can I ask, when they showed up, did they see the, I forget exactly, it was a methamphetamine pipe. Is that what it was in this case? That's correct, Your Honor. How? Well, but the question was, did they see it before they said he didn't live there? Or maybe you could address that. It would be before, Your Honor. What happened is Officer Rivera approaches the door. He knocks. He doesn't really get a response. He knocks, announces his presence as well. Doesn't really get in a response and waits about 40 seconds. Knocks again. Then the door opens slightly and he hears some sort of commotion. He describes it as sounding like someone is running. So he pushes the door open further. At that point, he sees defendant throw a methamphetamine pipe and then they exit the house. At that point, they say, hey, he doesn't live here anymore. So at that point, Officer Rivera certainly has, um, not only including all the case law, which says that these statements are teamed with seeing contraband just thrown in moments before that statement was made. Further, Your Honor, the government cites in its case to grant the Granberry decision, which in rebuttal or in reply, the defendant notes is a case dealing again with the search of a probation residence other than the one listed. However, the reason we cite that is because it really shows the importance of the information on the list. There, this court relied heavily on the fact that the defendant had told his probation officer six months before a different residence than the one that they actually ended up searched, searching. Your Honor, all the information Officer Rivera had when he saw 233 L. E. Street listed as Nick Wilson's address on the offender's list led him to believe that this was the correct address of Nick Wilson, and that was in largely, in large part due to corroborating facts that they knew given their past experiences. What about the this idea that warrant was written by it? Does that in and of itself give the officers any duty to look and say, Hey, you know, there's someone else we could call. What if those notes had been? What if it had been more specific and said, Hey, we've been trying to serve a warrant on him and we can't find him? Is there something about that that would have made it, um, less reasonable or unreasonable, I should say, for the officers to go to that address? The government believes there are likely some facts that if there were specifics in there, such as we haven't been able to find him at this residence because trying to serve this warrant or things like the court noted, then there may, at that point, be additional duty here. But just merely listing warrant is not sufficient to to detract from the motley decision. And the reason government would say this is warrants are dismissed for various reasons. And also again, we're dealing with the family home and not a some sort of transient living situation where it could be expected that he'd be moving once. If you went into custody, he got out. And again, there was no information that he went into custody based off that warrant status or his residence was going to change following that warrant status. Your Honor, just to address the court's, um, the issue raised by the court about Evans. Um, the government, upon further review, believes that the best course of actions for this situation is to vacate in part with very specific instructions to the district court to alter the conditions to comply with Evans. Um, and then the district court can then modify the commitment order. We understand that the original answering brief may not have been clear on this issue. But upon further review, we believe that's the correct course of action and authorized by the statute. And this court did this in a published opinion, United States v. Hall, which is a 9-12-F-3-D-12-24. And there the court struck the language that was unconsciously vague and vacated in part. And the district court at that point, um, issued a amended judgment to comply with Evans. And do you think the district court, would it have to just excise the offending provisions or would it have, would it be within the court's discretion on remand to, uh, you know, take another crack at writing something that gets at the same thing, but is not vague? Your Honor, the government is requesting that this court provide specific instructions, which they can do based on the statute. The statute specifically allows for you to provide whatever instructions you feel are necessary based on the issue. Um, so we believe that general instructions saying that, uh, that the condition should be vacated in order to be amended to comply with Evans would be, would be fine as well. We just believe it'd be a better use of judicial resources, resources to just be specific on that subject. I'm glad you said it all. I was gonna ask you about it. Yes, Your Honor. Anything else? Your Honor, unless the court has any further questions, the submit. Thank you, Counsel. Thank you, Miss Kim. Thank you, Your Honors. I just like to address two things. First, Judge Nelson mentioned the pushing of the door during when, which was when the meth pipe was seen on the floor. And this rationale wasn't raised by the government below. And we would argue seeing this argument for the first time, the answering brief that that itself was an unconstitutional entry into the home under this court's precedent. And at that time, the officers had the address information and the warrant information before them at the time they pushed open the door. I don't think the government is argued or could argue on this record that there was any sort of exigency requiring that door to be pushed open. Um, second, as to the status of this as a family home. Well, what about the idea that they heard some commotion inside? And I mean, doesn't that trigger an interest in what's going on? Maybe he is here and they're trying to hide him. You know, I mean, I'm not sure that it's not relevant, right? I think there are some scenarios where destruction of evidence or similar rationales could support that. But I don't think this rose to that level. And the government hasn't argued until the answering brief where suggested that it might. But, you know, there are the cases about people flushing things down the toilet or, you know, people running out the window. But there didn't seem to be any of this. There was also, as you can see from the video, an officer posted in the back, um, and around the corners of the house. Um, second, as to this being a family home, um, I think, based on the record here of the disturbances at this home, it evidently was the mother's and people are coming and going out of this home. Um, I don't think it's quite the same, you know, standard as if he were the owner of this home or the longtime resident versus that he is staying with his mother. And he said at the time, grandmother at this home. And I see that my time. Thank you. Thank you very much, Miss Kim. Thank you. Both counsel for your arguments in this
judges: Owens, Nelson, Miller